# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MARLIN MANLEY,

    *Plaintiff*,

v.

KATHLEEN LEFFINGWELL,[1]
JOSHUA BUSKIRK,
RICHARD GRING,
ADAM KANDULSKI,
MEAGHAN WALTERS,[2]
CORIZON HEALTH, INC.,

    *Defendants*.
_____/

CASE NO. 2:13-CV-13876-MFL-PTM

DISTRICT JUDGE MATTHEW F. LEITMAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Docs. 28, 65, 74))

## I.   RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants Corizon Health, Inc., Kandulski, and Buskirks's Motion for Summary Judgment, (Doc. 65) and Defendants Gring and Leffingwell's Motion for Summary Judgment, (Doc. 74) be **GRANTED** and Plaintiff's Motion for Summary Judgment, (Doc. 28) be **DENIED**. It is further recommended that Defendant Walters be dismissed from this action with prejudice. (*See* Doc. 64.)

---

[1] Plaintiff named this defendant as "Leftingwell, Register Nurse" in his Complaint. (Doc.1.) Responsive filings indicate that the correct spelling is "Leffingwell. (Doc. 75.)

[2] Plaintiff only named "Walters, dietician" in his Complaint. (Doc. 1.) This defendant's name is Meaghan E. Walters. (*See* Medical Records Filed Under Seal, Doc. 67-1 at 53.) Plaintiff never provided a current address for Defendant Walters despite an order from the Court to do so by August 1, 2014. (Doc. 64); *see discussion infra* Part D.3.

**II.    REPORT**

**A.    Introduction**

Plaintiff Marlin L. Manley, a former state prisoner, filed this *pro se* federal civil rights action under 42 U.S.C. § 1983 on September 11, 2013. (Doc. 1.) Plaintiff was incarcerated by the Michigan Department of Corrections ("MDOC") at the Saginaw Correctional Facility ("SRF") when the alleged Eighth Amendment violations took place. (Doc. 1 at 2.)

Defendant Corizon Health, Inc. ("Corizon") is a private company that provides medical staff to the MDOC. (Doc. 1 at 2.) Defendants Adam Kandulski, a medical doctor, and Joshua Buskirk, a physician's assistant, were employees of Corizon and treated Plaintiff while he was incarcerated at SRF. (Doc. 65 at 8-9.) Defendants Kathleen Leffingwell and Richard Gring were employees of MDOC while Defendant was at SRF; Leffingwell was a registered nurse and Gring was a corrections officer. (Doc. 74 at 5.)

Plaintiff complains that Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (Doc. 1 at 8-10.) All properly-served Defendants argue that summary judgment in their favor is appropriate because Plaintiff's colitis was in fact treated and a difference of opinion regarding treatment does not amount to an Eighth Amendment violation. (Doc. 65 at 18; Doc. 74 at 13, 14.) The MDOC Defendants Leffingwell and Gring also argue that they are entitled to qualified immunity. (Doc. 74 at 9.)

**B.    Summary Judgment Standard of Review**

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary

3

judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**C.    Background**

According to Plaintiff, in July 2012 he began to experience "severe abdominal pain, diarrhea, and blood in his stool"; he stated that he was assessed several times and then Dr. Kandulski sent him to the hospital. (Pl.'s Mot. Summ. J., Doc. 28 at 5.) According to the Medical Records Filed Under Seal, Plaintiff was evaluated at SRF for diarrhea, bloody stool, and abdominal pain and Defendant Buskirk treated him with infused IV saline. (Doc. 67-1 at 4-5; *see also* Certification of Adam Kandulski, M.D., Doc. 65-1 at 3.) On July 16, Defendant Leffingwell collected a lab specimen; on July 17, Defendant Buskirk ordered another IV and prescribed Immodium. (Doc. 65-2 at 4.) Plaintiff was sent to the hospital on July 19, 2012 because he had lost six pounds in six days and because he had increasing low right quadrant pain. (*Id.* at 4.) Plaintiff was hospitalized from July 19 to July 23, 2012. (Doc. 67-1 at 4-6.)

Plaintiff insists that during his hospital stay he was seen by an abdominal specialist who told him he had *ulcerative* colitis, prescribed Azathiprone, and recommended a low-residue diet. (Doc. 28 at 5.) Plaintiff was assessed by Defendant Leffingwell immediately upon his return to SRF (Doc 65-2 at 15; Doc. 28 at 5) and, according to Plaintiff, Nurse Leffingwell told him he would be seen by the physician in a day or two. (Doc. 28 at 5.) The sealed Subjective, Objective, Assessment, and Plan ("SOAP") note from July 23, 2012 shows that when he returned he presented to Health Care and stated he had been "diagnos[ed] with colitis"; he also stated that he was feeling better but still had diarrhea. (Doc 65-2 at 15.) Defendant Leffingwell attests that she assessed Plaintiff after he returned and scheduled an appointment for him with Defendant Buskirk, who reviewed his chart the next day on July 24. (Aff. Kathleen Leffingwell, Doc. 74-5 at 3.) On July 24, Plaintiff's

4

"hospital records were reviewed by the physician," and an appointment with Dr. Kandulski was scheduled for August 1. (Doc. 67-1 at 16.)

Plaintiff asserts that two days after his return from the hospital he started experiencing severe abdominal pain, diarrhea, and bloody stool and these symptoms continued for eight days before he was seen by a physician. (Doc. 28 at 5-6.) He also states that on July 30 he "went to [H]ealth [C]are . . . [and] informed [O]fficer Gomez" of his symptoms, and that Officer Gomez consulted with Defendant Leffingwell and then reported to him that she was aware of his problems and he should send a kite[3] to Health Care. (*Id.* at 6.)

Plaintiff contends that later on July 30 he went back to Health Care to complain about his symptoms and Defendant Buskirk told the nurse that "he did not want to give . . . [P]laintiff any type of medication until he was seen[] by [Buskirk] or the physician." (*Id.*) A Clinical Progress Note dated July 30, shows that Plaintiff complained about his symptoms recurring and that he was told by Darrel Barrows that he could not get a specific diet because "everyone's symptoms and triggers of Colitis [are] different." (Doc. 67-1 at 17.) The Note reflects that Defendant Buskirk was told that Tylenol was not relieving Plaintiff's symptoms and that Buskirk wanted to see Plaintiff before prescribing anything. (*Id.*) According to Dr. Kandulski, "[u]ntil final lab and test results were received, it was unclear whether the patient suffered from infectious colitis[,] which is caused by bacteria or a virus[,] or from a more chronic condition, such as ulcerative colitis or [an]other type Inflammatory Bowel Disease ('IBD')." (Doc. 65-2 at 5.)

At the scheduled visit on August 1, Dr. Kandulski noted that Plaintiff's symptoms "were consistent with IBD," (Doc. 65-2), so he recommended avoiding dairy and beginning prednisone treatment; Dr. Kandulski also planned to "aw[a]it colon biopsy" results. (Doc. 67-1 at 20-21.) Dr.

---

[3] A 'kite' is a Medical Care Request. (*See, e.g.*, Doc. 65-2 at 6.)

5

Kandulski decided to refer Plaintiff back to the hospital for evaluation that day because of his "complaints of left lower quadrant abdominal pain and diarrhea." (*Id.*) According to Plaintiff, while at the hospital, the abdominal specialist "told him that his ulcerative colitis symptoms had returned because the prison staff had failed to provide him with the medication and the low-residue diet." (Doc. 28 at 7.) Plaintiff also alleges that the abdominal specialist went into another room and called Dr. Kandulski to confront him about the decision not to give the low-residue diet and prescription. (*Id.*) According to Plaintiff, Dr. Kandulski explained to the specialist that he "wanted to try other medications and diets first" and that Plaintiff would be placed on prednisone when he returned. (*Id.*) Plaintiff asserts that the specialist told Dr. Kandulski that "prednisone would only make [Plaintiff's] symptoms worse[]. . . ." (*Id.*) Plaintiff also asserts that "as the abdominal specialist said, [P]laintiff's symptoms got worse[] and by the time he was seen[] by Defendant Kandulski [on August 7,] he had lost 19 pounds." (*Id.* at 7-8.)

Plaintiff was seen again by Dr. Kandulski on August 3, 2012 for a scheduled provider visit. (Doc. 67-1 at 22-25.) He "continued to report abdominal pain and bloody diarrhea, fatigue and weight loss" and Dr. Kandulski continued the prednisone, "which is a recommended treatment for ulcerative colitis and other types of IBD . . . ." (*Id.*) Dr. Kandulski also put Plaintiff on a clear liquid diet for three days until his next scheduled visit on August 7. (*Id.*)

On August 5, Plaintiff submitted a kite to determine if Azathioprine had been ordered for him after he returned from the hospital on July 23. (Doc. 67-1 at 28.) He was told the only prescription he had was for prednisone. (*Id.*) According to Dr. Kandulski, "Azathioprine is an immunosuppressant used in the treatment of chronic ulcerative colitis. In my opinion, it was not appropriate to prescribe [it] until it was determined what type of colitis [Plaintiff] . . . was experiencing." (Doc. 65-2 at 6.)

6

Plaintiff goes on to allege that early in the morning on August 7 he went to the officer's desk to report "that he was experiencing severe abdominal pain, diarrhea, and blood in his stool," and that Defendant Gring responded "that he did not want to hear it and that . . . [P]laintiff always had a[] medical complaint and for him to kite [H]ealth [C]are because he was not going to call them." (Doc.28 at 8; *see also* Dep. Marlin Manley, Doc. 74-2 at 7.) However, Defendant Gring swears that on August 7 Plaintiff approached him between 7:00 a.m. and 9:00 a.m., that he contacted Health Care for Plaintiff, and that in fact Plaintiff spoke on the phone with someone at Health Care for one to two minutes. (Aff. Richard Gring, Doc. 74-4 ¶¶ 5-6.)

On August 7, Plaintiff was again seen by Dr. Kandulski, was given a container to deposit a stool sample into, and instructed to immediately inform an officer once he had produced a sample so it could be sent to the lab as soon as possible. (Doc. 28 at 7-8.) Plaintiff claims he filled the container soon after and brought it to Defendant Gring to send to Health Care, but instead of following Dr. Kandulski's instructions Defendant Gring gave Plaintiff a direct order to return to his room because it was "count time." (*Id.*) Plaintiff stated that after "count" he returned to the officer's desk and Defendant Gring claimed to have called Health Care and received instructions to tell Plaintiff to bring the sample to Health Care during med line about an hour later. (*Id.*) Plaintiff alleges that Defendant Gring lied about contacting Health Care. (*Id.*) He claims that later that day when he was at Health Care he inquired about whether they had received a call from Defendant Gring and was told that he had not called. (*Id.* at 8-9.) Plaintiff submitted a kite to find out if Gring actually contacted Health Care that day; the Kite Response stated that "Many people worked that particular day . . . it would be near impossible to track down who exactly would have taken the call if it was made." (Doc. 67-1 at 44.) According to Defendant Gring, however, Plaintiff approached him at approximately 10:45 a.m., which was "count time," to deliver a sample to

7

Health Care. (Aff. Richard Gring, Doc. 74-4 ¶¶ 7-8.) He gave Plaintiff a direct order to return to his cell because "no movement is allowed" during "count time." (*Id.* ¶ 9.) He then swears that he "contacted [H]ealth [C]are and the nurse . . . indicated [Plaintiff] could bring his sample by when he came to [H]ealth [C]are for med lines." (*Id.* ¶ 10.) Gring also stated that Health Care contacted med lines between 11:15 a.m. and 11:45 a.m. (*Id.* ¶ 12.)

Regardless of whether Gring contacted Health Care, the sample was tested and according to Plaintiff, "[l]ater that day it was determined that . . . [P]laintiff had infectious diarrhea and Defendant Kandulski prescribed Ciprofloxacin and Methronnidazole . . . ." (Doc. 28 at 9.) According to Dr. Kandulski, "The colon mucosa results from the patient's colon biopsy had been received and reflected only mild, non-specific colitis. I discontinued the steroid prescription and prescribed antibiotics only as treatment for the patient's *infectious* colitis." (Doc. 65-2 at 6 (emphasis added).) Plaintiff took the medicine for five days and his diarrhea went away, but he "continue[d] to have sharp severe abdominal pain and fast jerking in his abdominal area." (Doc. 28 at 9.)

In his Motion, Plaintiff contends that when he was seen again by Defendant Buskirk on August 14, he asked about the medication and diet recommended by the abdominal specialist and was told he could talk to Dr. Kandulski about it and that MDOC did not offer a low-residue diet. (*Id.*) Dr. Kandulski saw him on August 27, and allegedly stated that "he did not think he needed the medication" prescribed by the abdominal specialist and that MDOC did not provide a low-residue diet but Plaintiff would be given a high protein snack bag detail. (*Id.* at 9-10.) Plaintiff claims that he was seen by Defendant Walters, that he told her about his symptoms and that he could not eat "foods high in fiber, whole wheat foods, brown rice, etc.," and that she "fe[]lt that he should continue to eat a[] normal diet" and to "save the apple . . . in the snack bag to substitute

for the foo[d]s he could not eat . . . ." (*Id.* at 10.) Plaintiff also claims that she switched him off of a high protein snack regimen and told him "he would be fine because he was at the normal weight of a[] person 5'8"." (*Id.*) Plaintiff goes on to claim that when he was transferred to another facility he was finally given a low-residue diet. (*Id.* at 10-11.)

According to his sealed medical records, by August 14, Plaintiff had gained some weight and the diarrhea, abdominal pain, and rectal bleeding had resolved, although he reported that certain foods still caused cramping and diarrhea. (Doc. 67-1 at 41.) Defendant Buskirk ordered an evening snack detail for Plaintiff to ensure adequate caloric intake in light of his recommendation that Plaintiff avoid his trigger foods. (*Id.* at 41-43, 48.) On August 18, Plaintiff sent a kite to Health Care complaining that the food, specifically the bread, milk products, and oatmeal, was causing him to have stomach pain; informing them that he would not eat it any more because he had colitis; and insisting on speaking with a dietician. (*Id.* at 45.) The Kite Response was that he had been evaluated by the medical provider and they were aware of the issue. (*Id.*) He was reinstructed to avoid the foods that caused him discomfort, reminded that nutritional supplements had been ordered for two weeks to ensure adequate caloric intake, and reassured that he had a follow-up appointment scheduled. (*Id.*)

Dr. Kandulski saw Plaintiff for a scheduled provider visit on August 22 and noted that his infectious diarrhea had resolved. (Doc. 65-2 at 7.) He recommended scheduling an appointment with a dietician to address Plaintiff's food concerns. (*Id.*)

Plaintiff was seen by Defendant Walters on September 28. (Doc. 67-1 at 55.) She noted that according to his record his infectious colitis had resolved but that he still experienced cramping and diarrhea when he ate "wheat bread, milk products, skins on potatoes[,] or rice . . . ." (*Id.*) He requested a morning snack detail because he was only being served foods he could not eat at

9

breakfast. (*Id.*) He also complained about his evening snack bag detail because he said that it mostly contained food he could not eat although he said he could tolerate the apples, meat, and cheese. (*Id.*) Defendant Walters assured Plaintiff that his "BMI indicate[d] he [was] at the top end of a healthy w[eigh]t range" and advised him to keep the fruit from his evening snack to eat for his breakfast. (*Id.*) She told him to "avoid large portions of the food" that caused him distress and to "slowly increase [his] intake of those foods as tolerated." (*Id.*) She also noted that Plaintiff currently had a high protein evening snack and decided to switch it to an regular evening snack for one month, reasoning that he had an intolerance of milk but could tolerate the fruit, and also considering the fact that he was gaining weight. (*Id.*) She also scheduled monthly weigh-ins for three months to monitor for changes in his weight. (*Id.*) Plaintiff refused to weigh in on several occasions because he insisted he was not being given a proper diet. (Doc. 67-1 at 62, 63, 64, 66, 74, 75, 76, 79, 82, 83.) He was a "no show" for a scheduled kited issue on January 30, 2013 (*Id.* at 81.)

**D.      Governing Law and Analysis**

**1.      Section 1983 Governing Law**

In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment Cruel and Unusual Punishment Clause because it constitutes the "unnecessary and wanton infliction of pain'" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 97, 104 (1976)). To establish a cognizable claim, Plaintiff's allegations must show Defendant's 'sufficiently harmful' acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary

10

and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,' and therefore will not violate the Constitution." *Id.*

The 'deliberate indifference to a serious medical need' inquiry incorporates objective and subjective elements into a two-pronged standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The objective inquiry is whether the deprivation was "sufficiently serious" and the subjective prong considers whether the state of mind of the official was sufficiently culpable. *Id.*

The Sixth Circuit distinguishes between allegations of complete denial of medical care and inadequate medical treatment. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "'Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Brock v. Crall*, 8 Fed. App'x 439, 441 (6th Cir. 2001) (quoting *Westlake*, 537 F.2d at 860 n.5.) A "difference of opinion between a plaintiff and his doctor regarding his diagnosis and treatment do[es] not state an Eighth Amendment claim." *Smith v. Sator*, 102 F. App'x 907, 909 (6th Cir. 2004) (citing *Estelle*, 429 U.S. at 107). An inmate who is treated but disagrees with treatment has failed to state an Eighth Amendment claim. *See Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Further, in *Mitchell v. Hininger* the Sixth Circuit found that prison officials were not deliberately indifferent to the plaintiff's serious medical need when their treatment did not conform to a specialist's recommended treatment. 553 Fed. App'x 602, 605 (6th Cir. 2014).

## 2.     Qualified Immunity Governing Law

When a defendant moves for summary judgment on the basis of qualified immunity, the analysis involves three inquiries.[4]

> (i) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred"; (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known"; and (iii) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Radvansky v City of Olmsted*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). Courts are no longer required to address these inquiries sequentially; instead a court may use its sound discretion to determine which of the prongs of the qualified immunity analysis should be considered first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Supreme Court has clarified the interplay between qualified immunity and the summary judgment standards found in Rule 56(c) of the Federal Rules of Civil Procedure:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

---

[4] In *Saucier v. Katz*, the Supreme Court identified only two of these prongs. 533 U.S. 194, 201 (2001). The second prong, however, integrated the "objective legal reasonableness of an official's conduct, as measured by reference to clearly established law." In *Dickerson v. McClellan*, the Sixth Circuit made the "objectively unreasonable" requirement a distinct third prong.

12

not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations omitted).

### 3. Analysis

#### a. Defendants Kandulski, Buskirk, Corizon, and Leffingwell

Beginning with the objective prong, that is the severity of Plaintiff's colitis, the parties disagree about whether Plaintiff had chronic ulcerative colitis or infectious colitis. (Docs. 28 at 5; (Doc. 65-2 at 6.) Even though all the objective medical evidence supports the conclusion that Plaintiff was afflicted with a bout of infectious colitis that resolved after a course of antibiotics, and only alleged hearsay statements from an unnamed specialist and Plaintiff's self-diagnoses indicate chronic ulcerative colitis, for the sake of argument I suggest that a genuine issue of material fact exists about whether Plaintiff's condition was sufficiently serious. *See, e.g.*, *Gallo v. Feinerman*, No. 07-CV-0032-MJR-SCW, 2012 WL 2872145, at *4 (S.D. Ill. July 12, 2012) (finding that it would be unreasonable to argue that ulcerative colitis was not a serious medical condition); *Williams v. Kushner*, No. C 10-2715 RMW PR, 2011 WL 4434808, at *3 (N.D. Cal. Sept. 23, 2011) (assuming *arguendo* that colitis was a serious medical condition). The only question left for Defendants Kandulski, Buskirk, and Leffingwell is whether Plaintiff has demonstrated Defendants' sufficiently culpable states of mind for the subjective component of the deliberate indifference analysis.

Because these Defendants each provided treatment to Plaintiff, and Plaintiff's only argument has to with his differing opinion regarding the nature of the treatment, I suggest that he has failed to show their sufficiently culpable state of mind. Just as in *Selby v. Martin*, this record "clearly reveals a competent and conscientious course of medical treatment, and [Plaintiff's]

13

dissatisfaction with his treatment does not state a claim under the Eighth Amendment." *See* 84 Fed. App'x 496, 499 (6th Cir. 2003).

Dr. Kandulski sent Plaintiff to the hospital twice as a precaution because he was concerned about the weight loss and abdominal pain. (Doc. 65-2.) He gave Plaintiff prednisone and put him on a liquid diet while he awaited test results just in case Plaintiff had a chronic form of colitis. (*Id.*) He refrained from prescribing an immunosuppressant, opting instead for the steroid prednisone, because in his medical opinion he needed to rule out infectious colitis. (*Id.*) When test results confirmed that Plaintiff's symptoms could be treated with antibiotics he took Plaintiff off the prednisone and administered the antibiotics; as a result, Plaintiff got better. (*Id.*) He also ordered a high protein snack bag detail and referred Plaintiff to a dietician when Plaintiff complained about sensitivity to certain foods. (*Id.*)

Defendant Buskirk's competent treatment of Plaintiff is also clearly evident from the record. Plaintiff asserts that Buskirk should have prescribed the Azathiprone that the specialist had suggested when he asked for it. (Doc. 28 at 13.) However, in Buskirk's opinion it was important to wait until Dr. Kandulski had determined if the medicine was necessary before prescribing it. (Doc. 65-4 at 4-5.) Also, Defendant Buskirk could not give Plaintiff the special diet he expected while it remained unclear "what was triggering his symptoms." (*Id.*) A precautionary liquid diet was determined to be more appropriate while tests were administered. (Doc. 65-2.) For the same reason, he hesitated to prescribe any pain medicine stronger than Tylenol. (Doc. 65-4 at 4-5.) Further, Defendant Buskirk also treated Plaintiff's initial symptoms with IVs and Immodium. (*Id.* at 2-4.)

Likewise, Defendant Leffingwell provided adequate treatment to Plaintiff, in the form of scheduling visits with Defendants Kandulski and Buskirk on August 23, and determining on

14

August 30 that Plaintiff did not need immediate medical assistance. (Aff. Kathleen Leffingwell, Doc. 74-5 ¶ 5, 11.) She fulfilled her role as a registered nurse of scheduling appointments and "assessed Plaintiff upon his return and scheduled an appointment with . . . Buskirk." (*Id.* ¶ 5, 8.) Further, in her professional opinion, Plaintiff did not appear to be in any immediate medical need on July 30, 2012. (*Id.* ¶ 11) And Plaintiff acknowledges that she told Officer Gomez that she was aware of his condition and that he could "kite [H]ealth [C]are." (Doc. 28 at 6.)

I suggest, therefore, that Plaintiff has failed to state a claim because he has not established that Defendants had a sufficiently culpable state of mind to meet the subjective element. *Farmer*, 511 U.S. at 834.

Defendant Leffingwell also argues that she is entitled to qualified immunity. (Doc. 74 at 9.) I suggest that the above analysis shows that even if the facts are viewed in the light most favorable to him, Plaintiff has failed to demonstrate that a constitutional violation has occurred. *See Radavsky*, 395 F.3d at 302; *see also Pearson*, 555 U.S. at 236 (allowing courts to analyze the qualified immunity prongs in any order). Further, even if Plaintiff were able to show a constitutional violation and that the right was "clearly established," he would not be able to show that Defendant Leffingwell's actions were objectively unreasonable. *See id.* She scheduled him for a visit as soon as he returned from the hospital. (Doc. 74-5 ¶ 5.) His chart was reviewed the next day and he was scheduled for an appointment with Dr. Kandulski on August 7. (*Id.* ¶ 6.) Plaintiff was not the only inmate with medical needs and he could not have expected to be seen immediately by a doctor when he went to Health Care about an issue that was already being addressed. For these reasons I suggest that Defendant Leffingwell is entitled for qualified immunity.

Regarding the claim against Corizon, it is well-established that an entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc.*

15

*Services of City of New York*, 436 U.S. 658, 693 (1978). Instead, Plaintiff must show that an official policy or custom of Corizon led to or caused his constitutional rights to be violated. *See Doe v. Clairborne Cnty., Tenn. By & Through Clairborn Cnty. Bd. Of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). Because Plaintiff has failed to establish that his constitutional rights were violated, and because he points to no specific unconstitutional policy or custom, I suggest that he has also failed to establish liability for Corizon.

### b. Defendant Gring

Plaintiff articulates two claims against Defendant Gring, both taking place on August 1.[5] First, he states that "Defendant Gring was required after [P]laintiff told him that he was having severe abdominal pain, diarrhea, and blood in his stool to call health care and inform them of it." (Doc. 28 at 13.) In his affidavit Defendant Gring swears that on August 7 Plaintiff approached him between 7:00 a.m. and 9:00 a.m., that he contacted Health Care, and that Plaintiff spoke on the phone with someone from Health Care for one to two minutes. (Aff. Richard Gring, Doc. 74-4 ¶¶ 4-6.)

Plaintiff's second complaint is that on August 7 Defendant Gring did not allow him to bring his stool sample to Health Care as soon as possible. (Doc. 28 at 13.) From Plaintiff's perspective getting the stool sample back to Health Care "as soon as possible" was an emergency because he wanted the results to be available the same day. (Dep. Marlin Manley, Doc. 74-2 at 8.)

There is no evidence that Defendant Gring had any information about the severity of Plaintiff's condition. In order to establish deliberate indifference, a prison official must "know of

---

[5] In his Motion, Defendant Gring expresses confusion about the number of claims against him. (Doc. 74 at 14 n.2 ("In his deposition Manley made reference to another claim against Gring . . . . However, there is no reference in the Complaint to another incident involving Gring.").) Defendant states that Plaintiff's "claim" against Gring is about the "adequacy of the healthcare he received on August 7." (*Id.*) However, in his Complaint Plaintiff indicates that two separate incidents took place on August 7 that involved Defendant Gring. (Doc. 1 at 5-6.) Defendant's confusion seems to be caused by the fact that both incidents occurred on the same day.

and disregard an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Plaintiff states that "[a]ll of the Defendants knew that [P]laintiff ha[d] a serious medical condition and Defendant Gring knew that he was required to call [H]ealth [C]are after the [P]laintiff told him about the symptoms he was having and . . . to send him over to [H]ealth [C]are when the stool sample was ready." (Doc. 28 at 14.)

For the objective prong in the first claim against Defendant Gring, Plaintiff must show that the abdominal pain was sufficiently serious, and in the second claim that the need to get lab results back on August 7 was sufficiently serious. *See Farmer*, 511 U.S. at 834. I suggest that neither were sufficiently serious. In the case of the abdominal pain, Plaintiff had a visit scheduled with Dr. Kandulski later that day and had other means of contacting Health Care by sending a kite. In the case of the lab results, Plaintiff did, in fact, get the results back later that day. Plaintiff needs to establish both the objective and the subjective prong. Because he is unable to show the objective prong, this Court need not consider whether Defendant Gring had a sufficiently culpable state of mind, as evidenced by his alleged refusal to call Health Care or allegedly lying about contacting Health Care.

Defendant Gring also argues that he is entitled to qualified immunity. (Doc. 74 at 9.) I suggest that the above analysis shows that even if the facts are viewed in the light most favorable to him, Plaintiff has failed to demonstrate that a constitutional violation has occurred. *See Radavsky*, 395 F.3d at 302; *see also Pearson*, 555 U.S. at 236 (allowing courts to analyze the qualified immunity prongs in any order). Further, even if Plaintiff were able to show a constitutional violation and that the right was "clearly established," he would not be able to show that Defendant Gring's actions were objectively unreasonable. *See id.* In the case of contacting

17

Health Care in the morning of August 7, even if the facts are viewed in the light most favorable to Plaintiff, and it is believed that Gring refused to contact Health Care, there were other ways that Plaintiff could contact Health Care. In the case of ordering Plaintiff back to his cell during count time, Defendant was not only acting reasonably, but fulfilling his job as a corrections officer since there is to be no movement during count time. (Doc. 74-4 ¶ 9.) Further, the stool sample did get to Health Care and the results were obtained later that day. (Doc. 28 at 9.)

    c.    **Defendant Walters**

Plaintiff contends that "Defendant Walters was required to place [him] on a low-residue diet. However, she chose to take an easier but less efficient course of treatment which denied [P]laintiff of an adequate nutritional diet." (Doc. 28 at 14.)

On June 27, 2014 this Court notified Plaintiff that unless he provided a current address for Defendant Walters on or before August 1, 2014, a report and recommendation would be filed recommending that Defendant Walters be dismissed without prejudice from this action. Plaintiff did not provide a current address for Defendant Walters, and therefore I suggest she be dismissed from this action. (Doc. 64.)

Further, I suggest that the action against Defendant Walters be dismissed with prejudice because the same analysis that applies to the other Defendants also applies to her. Plaintiff does not allege that he was not treated by Defendant Walters, only that he disagreed with the treatment provided. (Doc. 28 at 14.) Just as in *Selby*, this record "clearly reveals a competent and conscientious course of . . . treatment, and [Plaintiff's] dissatisfaction with his treatment does not state a claim under the Eighth Amendment." *See* 84 Fed. App'x at 499. Walters ensured that Plaintiff was gaining weight and that he would have access to the calories he needed in the morning. (Doc. 67-1 at 55.) She even noticed that he would likely have problems with a high-

protein snack bag and switched him to a regular snack bag. (*Id.*) She encouraged him to very slowly reintroduce the triggering food into his diet as he was able to tolerate doing so. (*Id.*) She also scheduled periodic weigh-ins to ensure that he was able to maintain adequate caloric intake while on her plan. (*Id.*)

**E.     Conclusion**

For all the reasons stated above, I recommend that Defendants' Motions for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. I further recommend that the action against Defendant Walters be dismissed with prejudice.

**III.     REVIEW**

Rule 72(b)(2) of the Federal Rules of Civil Procedure provides that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not

later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 14, 2014    /S PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record. A hard copy was served by first class mail on Marlin Manley, 7532 Dexter Ave., Detroit, MI, 48208.

Date: October 14, 2014    By   s/*Jean L. Broucek*
Case Manager to Magistrate Judge Morris